AMP-RITE ELECTRIC COMPANY, INC., Plaintiff-Appellee, v. WHEATON SANITARY DISTRICT, Defendant-Appellant.

Second District   No. 2—90—0906

Opinion filed October 17, 1991.

Michael Resis, of Querrey & Harrow, Ltd., of Chicago (Paul T. Lively, of counsel), for appellant.

Robert R. Verchota, of Donovan & Roberts, P.C., of Wheaton (Rodney W. Equi, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The plaintiff, Amp-Rite Electric Company, Inc. (Amp-Rite), one of three prime contractors hired by the defendant, Wheaton Sanitary District (the District), for the District's wastewater treatment plant additions project (the project), sued the District for breach of contract. Count I charged that the District breached its contract with Amp-Rite in that it (a) failed to furnish, as indicated in the contract and not later than the date when needed by the plaintiff, the lands upon which its work was to be done; (b) failed to keep the buildings in such a state of forwardness so as to enable it to perform its work within the time contemplated in the contract; (c) actively created or passively permitted to continue a condition over which the District had control which rendered its performance under the contract more difficult and more expensive; and (d) failed to grant its requests for an increase in contract price. The gist of Amp-Rite's count I was that it incurred costs in excess of its bid for the project work because the District failed to control and coordinate the work of the other two prime contractors so as to keep the project moving forward according to the construction schedule set forth in the contract. Count II charged the District wrongfully withheld $9,500 from Amp-Rite as liquidated damages for delayed completion of its work.

The other two prime contractors on the project were the general construction contractor, Wil-Freds, Inc. (Wil-Freds), and the plumbing, heating and ventilating contractor, Northwestern Industrial Piping, Inc. (Northwestern). The District also contracted with Strand Associates, Inc. (Strand), to prepare contract documents, to provide consultation and advice during construction of the project, provide resident engineering services to the project and maintain overall review of the project.

Litigation arising out of the project delays was originally instituted by Wil-Freds, followed by Amp-Rite. Those cases were consolidated following which the District filed third-party complaints against Northwestern, claims against Wil-Freds and Amp-Rite and, ultimately, Strand. An action commenced against Wil-Freds by its subcontractor, Kocurek Concrete Contractors, Inc., was also consolidated with the

Wil-Freds and Amp-Rite causes. With the exception of the instant cause, all these claims have been settled and dismissed.

It is undisputed that the project was delayed. The source of those delays was disputed. Delays from the District's perspective include the flooding of the deep foundations at the sand filter building where work on the project first began, Northwestern's inability to deliver various embedded items as needed by Wil-Freds, and Northwestern's inability to cause its underground pipe subcontractor, Davis Sewer and Water, to complete expeditiously the concrete pipe excavation and installation.

Amp-Rite perceived that its work was delayed and increased costs were incurred primarily due to: (1) flooding of the sand filter building excavations at the beginning of the job; (2) Wil-Freds' scheduling of concrete pours in sections for foundation walls and floors of the new structures; (3) Wil-Freds' pouring foundation walls and floors in more than one building at a time; (4) Northwestern not doing its excavation and installation of underground pipe for those runs where Amp-Rite wanted to install its underground conduit in Northwestern's trenches; (5) other contractors damaging Amp-Rite's work; (6) difficulty experienced by Amp-Rite in doing electrical work on equipment furnished by Northwestern; (7) problems with Amp-Rite's subcontractor, Allen Engineering; (8) noncooperation by Wil-Freds and Northwestern; (9) the physical condition of the site; and (10) acts of God. Amp-Rite claimed that these various factors combined caused it to incur increased costs totaling almost $254,000.

Following a jury trial of Amp-Rite's claims against the District, a verdict in Amp-Rite's favor in the amount of $163,000 was entered on count I, and a verdict in Amp-Rite's favor in the amount of $9,500 was entered on count II. Without conceding the propriety of the verdict on count II, the District appeals here only from the jury's count I verdict.

The District contends its motion for directed verdict and post-trial motion for judgment notwithstanding the verdict should have been granted. The District claims (1) that the court misconstrued its contractual obligations to Amp-Rite; (2) that Amp-Rite failed to prove that the District breached its contract with it; (3) that Amp-Rite failed to prove its damages under the "total cost" theory; (4) that Amp-Rite's proof of its other damages was insufficient; and (5) that the jury was improperly instructed on the matter of the District's contract obligations and the calculation of damages.

## AMP-RITE'S BID PREPARATION

The project work advertised for bid by the District included the rehabilitation of existing facilities and the construction of new wastewater treatment facilities. It was divided into three possible contracts: general, plumbing, heating and ventilation and electrical. Bidders could submit a bid for each separate contract, for a combination of any two, or for all three. Based on its criterion of achieving the lowest total project cost and, after Strand determined they were qualified and responsible bidders, the District awarded the general construction contract to Wil-Freds, the plumbing, heating and ventilation contract to Northwestern and the electrical contract to Amp-Rite. By awarding these three contracts separately rather than to one contractor who would do all the work, the District avoided additional costs in the amount of approximately $847,000.

Preparation of Amp-Rite's bid on the project was a three-step process. First, an estimator, Dan Voss, reviewed the specifications and drawings for the project including the length of the project and the direction the job was to progress. He then did a material "takeoff," counting all the materials shown such as light fixtures, and measuring the quantity of conduit and wire shown on the drawings. These were added up and labor units assigned to the materials. In estimating the labor units required, Voss used the National Electrical Contractors Association (NECA) manual of labor units as a guide. The manual suggests labor units to be applied for the installation of each fixture, device and length of conduit wire, and it allows "factoring," an adjustment of labor units upward or downward, based on numerous considerations such as weather conditions, the height of the installation, multiple and/or parallel conduit runs, and works in the same area. For instance, pulling seven wires through a conduit as opposed to pulling just one takes about the same time. The manual instructs users that the selection of the appropriate labor unit is usually a matter of judgment and that the least favorable installation physical condition normally dictates the selection. Voss testified the general construction schedule set forth in the contract documents, which Amp-Rite believed indicated the project would progress from west to east, was considered in factoring the labor units because it meant the workers would be in one area and not traveling back and forth to multiple points of construction at the same time and that the buildings at the west end of the project would be enclosed during the winter of 1983.

Voss' estimate took into account that the underground conduit to be installed on the south side of Spring Brook Creek at the west end

of the project would be "piggy-backed," that is, it would ride above the piping contractor's pipes which were at a much lower depth than the conduit. The piping contractor would trench to approximately 18 feet, lay its pipes and backfill to a level of about three feet below the finished grade. Backfilling would be interrupted at that point, electrical conduit would be laid and backfilling to finished grade level would be continued. Voss' estimate did not take into account the fact that the project work could be awarded on a multiple prime contract basis.

The labor units for Amp-Rite's estimate were assigned directly from the NECA manual by Voss and then modified by Amp-Rite's senior estimator and its president to take into account the numerous multiple conductors, parallel runs, etc., as well as Amp-Rite's past experience in electrical construction work. According to the NECA manual, projects such as chemical plants and power plants and other heavy industrial projects did not warrant reduction of labor units. Amp-Rite did not believe the instant project fell within that category because the physical sites of such heavy industrial projects would have been much larger, the buildings would have been extremely large, with ceilings 30 to 35 feet high, compared with 8- to 15-foot ceiling heights here. Electrical installations in a 30-foot-high ceiling would require use of hoist equipment whereas an 8- to 15-foot ceiling would require only a ladder. A normal amount of nonproductive labor such as walking, tool acquisition and other craft coordination time is also included in the NECA labor units.

Voss' work product was turned over to Amp-Rite's senior estimator, Mack Williamson, who factored the NECA labor units based on his education, his experience in the military with power generation plants and his years as an electrician. Williamson's labor estimate for the project was 4,040 hours. That figure was further reduced to 3,806 hours, representing a $17,000 reduction in its final bid, by Ron Adaska, Amp-Rite's president. He also reduced the materials cost by $21,000. Based on his review of the drawings and specifications and on his personal experience that labor productivity in Du Page County is very high, Adaska believed the reduction in labor hours was warranted. Amp-Rite had never handled a wastewater treatment project before, but it did a $1.25 million electrical project for the Amoco Research facility project in Naperville, a complex computer control process facility for Color Tile in West Chicago, and the four-story civic center in Aurora.

Amp-Rite's project manager, John Patelski, stated he believed Amp-Rite's bid was reasonable based on the spread between its bid ($599,900) and the next two low bidders ($632,000 and $642,381).

Amp-Rite relied on the plans and specifications, including the general construction schedule contained in the contract documents, in preparing its bid. Based on those documents, Amp-Rite knew it had 14 months to do the work and the progression of the work from west to east during that time period would mean that the west end facilities would be completed during the spring, summer and fall months of 1983. The west underground work would be completed around the same time, and the buildings on the west end would be enclosed during the winter of 1983 to 1984; thus, Amp-Rite would not have workmen working in adverse conditions in the winter. Patelski knew when Amp-Rite entered into the contract that it would have a difficult time coordinating the project because of the nature of the job and the completion date. He also was aware that its estimate did not take into consideration how long any other contractor's operations would take because Amp-Rite's work was that of a follow-along contractor. Amp-Rite's expert witness, Dr. James Adrian, a professor of civil engineering in construction, testified at trial that he reviewed the project specifications and drawings and Amp-Rite's bid preparation process. He concluded the estimate was prepared reasonably and that the labor hours contained an allowance for normal inefficiencies.

In response to Amp-Rite's bid preparation evidence, the District presented testimony from Charles Beggs and its expert witness, William Ryan. Charles Beggs was the project superintendent for Amp-Rite for about half the duration of the project. Beggs ultimately was fired by Amp-Rite in June 1985 due to his philosophical differences with Amp-Rite's management. It was Beggs' belief that Amp-Rite regularly underbid on projects in order to win the bid and that practice was a continuing source of disagreement between them. Beggs agreed, however, that Amp-Rite showed a profit for each year of its existence.

Beggs believed that Amp-Rite underbid the instant project as well and that the work conditions involved in the project were not the least difficult ones as determined in the NECA manual, although that was the level of difficulty reflected by the labor units assigned in Amp-Rite's bid. Beggs felt a higher difficulty level was merited because the project involved a number of structures requiring electrical work in high ceilings and installations to and around large pieces of equipment. Beggs was told that Amp-Rite's bid was prepared with the idea that the job would not be manned on a full-time basis, an approach Beggs did not feel was reasonable except for the initial temporary service installation stage of the project. Beggs was also told that Amp-Rite's conduit would be piggy-backed with the Northwestern pip-

ing in some instances. This would mean that if Northwestern's work was delayed, Amp-Rite's would be, too. If that occurred, the starting and stopping would increase the required number of man-hours to install that conduit. Beggs admitted that, in some areas along the south side of Spring Brook Creek, there was nowhere else Amp-Rite could lay its conduit except above Northwestern's pipe. Beggs stated that even if the plans and specifications showed the conduit and piping in the same location, it was up to all the contractors to put together their shop drawings and coordinate what the location would actually be. Such coordination work would be done after the job was estimated and bid, and, at the time the job was estimated, it would not be known who the general or other contractors were going to be.

William Ryan, of William A. Ryan & Company, a construction cost-control firm, was presented as the District's expert witness. At the District's request, he prepared an unfactored labor estimate for the project using the NECA manual and the plans and specifications for the project. Ryan believed that, in his experience, wastewater treatment plants are similar to chemical plants for estimating purposes due to the in-then-out flow process which occurs in both. His straight NECA estimate of labor hours required for the instant project was 9,433 hours, which was adjusted by subtracting 125 hours due to Amp-Rite's intended utilization of Northwestern trenches for its conduit. Ryan's opinion as to the adequacy of Amp-Rite's estimate was that it underbid the project.

Ryan, a nonelectrician who is not in the building business, admitted he knew of no one who ever got a bid based on an unadjusted, unfactored NECA manual labor hour estimate. He agreed his labor estimate would have put his bid in last place on the instant project. Ryan personally does not use the NECA manual to prepare bids, nor did he see the drawings Amp-Rite made prior to its bid. He agreed productivity is adversely affected by cold weather and that fanning out over the whole project rather than going from west to east as he understood the project was to progress would negatively affect productivity. His 1,856-hour estimate for supervisory controls included the installation and wiring of control devices, and the labor hours he assigned to wire-pulling were based on having a separate conduit route from each motor to its source of power.

In rebuttal, Amp-Rite's Dan Voss testified that the control devices were to be factory mounted and wired, and, thus, Amp-Rite's labor hour estimate only included time for hook up to the screw on the bottom of the unit supplied by Allan Engineering. Amp-Rite's estimate also reflected the shortest path from fixtures to junction boxes in esti-

mating the amount of conduit required which, in turn, would affect the number of labor hours being estimated. The amount of Amp-Rite's subcontract with Allan Engineering was included in Amp-Rite's bid.

PROGRESS OF CONSTRUCTION

As the general construction contractor, Wil-Freds was responsible for the excavation of the site, the pouring of concrete foundations and structures, the pouring of concrete walls and the erection of masonry walls, the installation of building roofs, interior carpentry, other building finish work, and, finally, landscaping. These work items are referred to as "general" work. Wil-Freds was not a general contractor in the sense of the District having a contract with one general contractor who in turn subcontracts with all of the trades required to build a project.

Northwestern was responsible for the plumbing, heating and ventilation system work. Its work included underground installation of heavy concrete pipes which connected the buildings and structures. Its work also included supplying various sleeves, thimbles, and gates to be installed by Wil-Freds where the underground concrete pipe interfaced with the foundations poured by Wil-Freds. These items are referred to as "embedded" items.

Amp-Rite's electrical work included installing electrical conduit in the concrete walls and foundations being poured by Wil-Freds. This is referred to as "rough-in" work. It also included furnishing and installing electrical equipment in new and existing structures. This equipment and the equipment furnished by the other contractors was connected by electrical conduits installed underground. In certain locations, these conduits were to track generally the underground concrete pipe to be installed by Northwestern. The project plans depicted the conduit and the concrete pipe lying in the same approximate horizontal plane except that the concrete pipe was to lie at a vertical depth several feet below the depth of the electrical conduit.

Amp-Rite began its work late in May 1983. After installation of temporary services, Amp-Rite began to encounter delay in its work in the sand filter pump station and sand filter building at the west end of the site due to delays by Wil-Freds in pouring concrete and framing walls and by Northwestern in its sewer pipe installation. Heavy rains early in the project accounted for some of this delay because of flooding of the excavation in the sand filter building. Further flooding occurred when an excavated sewer pipe was left unplugged. The minutes of monthly job progress meetings attended by all the contractors and the District's engineer, Strand, were admitted in evidence. On

August 1, Amp-Rite's project manager, John Patelski, reported Amp-Rite considered its work to be eight weeks behind schedule and requested the contract completion time be extended. The District responded that Amp-Rite's concern was premature. Patelski continued to report delays at each subsequent monthly job progress meeting.

By December, Amp-Rite estimated its work was only about 20% to 25% complete. A change in the general west-to-east construction schedule set forth in the contract documents occurred late in October to November. Wil-Freds began working in areas other than the west end of the facility in an attempt to make up for past delays and to meet its contract completion date. Amp-Rite followed along with Wil-Freds in order to accomplish electrical rough-in work before Wil-Freds poured concrete or finished walls in those areas. Working in numerous areas at one time, Amp-Rite's work became inefficient in that Amp-Rite would rough-in a slab, which then may not be poured right away, and it would have to return to the area to make sure the conduits were still plumb and had not been damaged due to some other construction traffic in the area. Patelski testified that Wil-Freds was uncooperative. When Amp-Rite's foreman would ask about where Wil-Freds would be working that day, he would be told, "Just watch us."

In spite of the delays, and concerned with its own completion date, Amp-Rite kept its men on the job. There was always some amount of work to be done. Amp-Rite feared that it would either be poured out of a concrete slab or wall that it needed to get conduits in or buried in another area where it needed to install conduit.

Amp-Rite experienced significant delays in installing its underground conduit along Spring Brook Creek. Northwestern's work admittedly was six months behind by January 1984 due to difficulties with its own excavation subcontractor, Davis Sewer & Water. In certain areas along the creek, Amp-Rite's conduit could only be piggy-backed over Northwestern's deeper piping because there was no room for side-by-side installation. Amp-Rite's proposal for an alternate conduit run on the other side of the creek at an additional $14,000 to $15,000 cost to the District was rejected unless Amp-Rite would agree to absorb the cost itself.

Amp-Rite formally requested an extension of contract completion time and an increase in the contract price in February 1984. In May, the District granted this request, giving Amp-Rite a 15-week extension, which extended its contract completion date from July 31, 1984, to November 13. The District tabled the issue of the contract price increase until completion of all the work.

Patelski stated that three buildings on the west end of the site, which Amp-Rite contemplated would be enclosed by winter of 1983, were not. The only interior work ready to be done during the winter months was in the sludge dewatering building. That building was available as the result of the construction of a temporary chlorination facility which was not called for in the original plans for the project. The buildings on the west end of the project site during that winter consisted of partially constructed foundations and partially constructed walks. Open excavations throughout the site complicated travel to and from the construction areas. Amp-Rite's equipment, which was contained in trailers on the west end of the site, had to be maintained in that location until there were enclosed buildings.

The 3,806 labor hours on which Amp-Rite's bid was based were exceeded in May 1984 with only about one-half the project complete. Amp-Rite attributed the exhaustion of its labor budget to the inefficiencies created by working back and forth across the entire one-third mile span from west to east; roughing in areas for preparation for work by other contractors which was then not done; repairing of damage done by others to that roughed-in work; gearing up to do work and then having to wait for the work of other trades to be done; and the lack of an orderly progression of work from one point to another. Normally labor units assigned for various tasks anticipate a reasonable amount of starting and stopping of work; the instant project included an extraordinary amount of starting and stopping of work.

Amp-Rite formally requested a second extension of the contract completion time and an increase in contract price in October 1984. The District denied this request in mid-November; however, its subsequent assessment of liquidated damages against Amp-Rite was calculated from January 17, 1985, to its substantial completion date on February 6, 1985, rather than from Amp-Rite's previously extended completion date of November 13, 1984.

Robert Clavel, the managing engineer of the District, testified for the District and was also called as an adverse witness by Amp-Rite. A primary requirement of the construction schedule was that wastewater treatment and sludge handling be continuous and equal to that achieved prior to the start of the project. Because of that requirement, construction on the primary sedimentation tanks and preliminary treatment plant, located at the east end of the site, was not to begin until the sludge dewatering building, also located at the east end of the site, was complete and operational. At that time, the sludge dewatering building also contained the chlorination facilities. New chlorination facilities were going to be provided, however, south

of the sand filter building which was located on the west end of the site. Consequently, the new chlorination facility had to be complete and operational before demolition work on the sludge dewatering building at the east end could be begun in order to achieve the continuous and equal wastewater treatment required under the general construction schedule. Clavel stated the contractors were free to start where they wanted as long as the facilities to be in operation were left in operation.

Clavel testified it was Wil-Freds' belief that, in order to complete the job on time, it had to complete all the "major" concrete work by the end of the calendar year 1983. This major concrete work included structures located at both ends of the site. Wil-Freds began its work at the west end of the site on the sand filter pumping station, the sand filter building and clearwell/chlorine contact tank and moved progressively eastward. Although notified by the corps of engineers after its August inspection for the EPA that Wil-Freds was behind schedule, the District took no action. Wil-Freds worked in more than one structure at one time as excavation, framing and concrete work sequentially were being done in those structures.

Late in October, the District decided construction of a temporary chlorination facility would accelerate the progress of the project since no work had begun or could be begun on the demolition of the sludge dewatering building at the east end until the chlorination facilities at the west end were operational. The District ordered the contractors to construct temporary chlorination facilities so that (1) with winter coming, it would give the contractors the sludge dewatering building to work in and (2) with the prospect of the new chlorination facilities at the west end not being ready until the summer of 1984, it would accelerate the project schedule by allowing the sludge dewatering building work to be done before, rather than after, completion of the new chlorination facilities. Because quality masonry work could not be achieved during the winter months, Wil-Freds' masonry schedule was extended forward from December 31, 1983, to May 31, 1984. This caused concern for Amp-Rite because it planned to work inside the structures during the winter months.

The District participated in all weekly job coordination meetings with Strand and the contractors as well as monthly job progress meetings. It also met with and assisted the contractors in developing written schedules. Late in September, the District wrote to Northwestern expressing its concern about Northwestern's progress. Wil-Freds had planned to incorporate certain embedded items in its forming and pour concrete around them, but those embedded items had

not been provided, and Wil-Freds had to work around that problem. The District's letter also expressed concern with the performance of Northwestern's subcontractor, Davis Sewer & Water, but it never told Northwestern to get Davis off the job. Because certain of the embedded items were standard manufactured items, the District waived the requirement of shop drawings to enable Northwestern to order the items earlier than it would have been able to if drawings were required.

The District wrote Northwestern again in October about its concern with the delivery of manholes and other material required to get the underground piping in to make room for other contractors to complete their work. It advised Northwestern that it declined to approve Northwestern's payment request, but would reconsider it after it received an acceptable response as to how Northwestern proposed to proceed.

Northwestern complied with the District's request for its completion schedule for those particular segments of the work. The District created a bar chart schedule based on the information it received from Northwestern, and it forwarded it to Wil-Freds so that Wil-Freds could schedule its work along with Northwestern. Two copies of Wil-Freds' revised construction schedule were forwarded to Amp-Rite in November 1983. The District's cover letter to Amp-Rite acknowledged that the schedule "obviously creates some problems for completion of your contract," but noted that once Northwestern provided a similar schedule there would be a meeting to resolve any conflicts. The District took no action on Amp-Rite's November 1983 request for an extension of contract time based on Northwestern's lack of progress in its underground work.

Similar scheduling information was not received from Northwestern until the District threatened to withhold money. The scheduling finally received showed Northwestern's work was six months behind schedule; the District took no punitive action at that time, nor did it do anything to get someone else in there to get the job done. Although a "critical path" schedule was prepared in April 1984, Northwestern was unable to adhere to any of the completion dates.

Although the District was aware of delays early on in the project, the District's policy was that extensions of contract time do not give contractors incentive to achieve the earliest possible completion date. Under the contract provisions, there were several punitive measures which the District could apply against the contractors: it could withhold payments, take over the work of the contractor, or terminate the contractor. The District did not utilize those measures because it be-

lieved they would only exacerbate the delays it was trying to alleviate. It did write letters to the offending contractors requesting action and improved performance. When the critical path schedule for construction was prepared in April, it revealed a need for a third underground crew. The District threatened Northwestern that, unless it provided such a crew, the district would hire another contractor to do the work and deduct the cost from the funds due Northwestern. Northwestern did supply the third underground crew. The District felt that to terminate Northwestern would be even more disruptive to the schedule since a new contractor would have to be found and, if Northwestern's bond company could not provide one, competitive bids possibly would have to be undertaken again, assuming the price of the contract would have increased with the passage of time.

Wil-Freds complained in February 1984 that its ability to coordinate with Northwestern was hampered by its lack of direct control of Northwestern. It necessarily looked to the District as the contract holder for backup in this regard, and it did not feel the District was pressuring Northwestern. Clavel could not recall if the District took any action in response to Wil-Freds' complaint. The District's position was that the contractors, not it, had the duty under the contract provisions to coordinate the work. Nonetheless, the District believed that it facilitated and got actively involved in that coordination process through the progress meetings, its letters to the contractors and its threatened punitive actions.

Clavel admitted it was his recommendation to the board in May 1984 not to grant Amp-Rite's contract time extension request because Amp-Rite refused to waive its claim for extra compensation. He agreed that if the owner does not enforce its contract with the individual prime contractors, there is substantial risk that none of the prime contractors will perform in accordance with the contract. Clavel acknowledged that he reported to the District's board in January 1984 that coordination of the project is much more difficult with three prime contractors, but that it nonetheless appeared that the $847,000 cost savings justified the extra effort.

Amp-Rite's project foreman, Tom Walsh, testified as an adverse witness for the District and for Amp-Rite. Because Amp-Rite was a follow-along contractor, Walsh had no written schedule for work. He testified that if, after gearing up for certain work, the workers would have to be redeployed somewhere else, it would take additional time. He started preparing a daily job log on the project late in November 1984 when things seemed not to be going as they should have been; he recorded most of the things his men were doing on any particular

day. In working with Northwestern on getting Amp-Rite's underground conduit in, Amp-Rite would wait until there were about 100 feet or so to be put in, do the work, and then have to wait for Northwestern again to put in more pipe. The actual installing of the conduit did not take any more time, but the start-and-stop method of installation did. Amp-Rite also "hopscotched" from one end of the site to the other because Wil-Freds would put up a wall at one end of the site and then a wall at the other end of the site. Wil-Freds was uncooperative; it would say, "Just watch where I pour and you follow me and you better be in there or else we are pouring over you." Walsh would line up his workers at one building, and Wil-Freds would pull out its carpenters and go somewhere else. Winter working conditions caused a lack of productivity.

Walsh stated allocation of workers' hours to certain job codes could show an overlap due to the starting and stopping of tasks under different codes. He also stated that temporary lighting facilities generally could be moved progressively from one completed building to the next one being constructed, but here temporary power in all the buildings was needed. Amp-Rite cooperated with the other trades when there was a small break which did not amount to anything major; Amp-Rite would just do the job. Otherwise, Walsh would write up the work as an extra. Walsh believed he had the men necessary to complete the job by the original July 31 date.

As an example of the noncooperation of other prime contractors which caused Amp-Rite to expend additional time, Walsh related that his men roughed in a concrete slab in a blizzard because Wil-Freds said it was going to pour it the next morning. Wil-Freds' men did not work on that slab for the next two weeks. When the sand filter building electric room ground was frozen and had to be thawed, Wil-Freds refused to build a shelter higher than three or four feet; Amp-Rite requested one six feet high so that Amp-Rite could work inside installing conduit when the ground thawed. As a result, Amp-Rite workers had to work on their hands and knees and go out of the structure into the cold to bend and thread some of the pipes. Walsh stated the site "looked like a bomb hit it"; open excavations spanned the entire site. Until a building was poured and had a roof on it, Amp-Rite's tools and materials had to be kept in and retrieved from the main trailer at the west end site even though work was being done at the east end of the site. Amp-Rite workers had to use catwalks in order to install the conduit into the walls and slabs; backfilling could not be done because the material was frozen. Walsh stated the electricians took longer to

do their work because of the hopscotching, the long travel times and the conditions of the site.

PROJECT COMPLETION AND DAMAGES

When the District denied Amp-Rite's second request for an extension of the contract time in November 1984, it again suggested tabling the matter of the contract price increase until the completion of the work by all the contractors. The District warned that if Amp-Rite was eventually determined to be entitled to additional costs, the District would look to both Wil-Freds and Northwestern for reimbursement. No formal action was taken by the District on Amp-Rite's December 28, 1984, request for a certificate of substantial completion. Rather, the District informed Amp-Rite that its substantial completion date was February 6, 1985, and that liquidated damages of $9,500 would be assessed, at a rate of $500 per day, from January 17, the date Strand felt Amp-Rite could have been done with the work. Liquidated damages were also assessed against Wil-Freds in the amount of $56,400 and against Northwestern in the amount of $62,000. As noted above, Amp-Rite claimed the various delays caused it to incur damages in the amount of $254,000.

Amp-Rite's project manager, John Patelski, testified that Amp-Rite tried to calculate a specific amount of delay and dollar value for each item of delay but found it was not possible. He said it would have required having someone follow workers around the jobsite as work was being done and try to compare the length of time it took them to do the work with what it would have taken them under normal circumstances. The "ripple" effect—one delay leading to another—compounded the problem of trying to identify separate items of delay.

Patelski testified that Amp-Rite's claim for $22,309 for additional foreman expenses for Tom Walsh was based on the supervisory hours expended by Walsh (approximately 60% of his time as a "working" foreman) beyond the July 31, 1984, date multiplied by his wage rate and an overhead factor. The same formula yielded Amp-Rite's claim for $1,455 for superintendent Beggs' additional time. Even though Beggs was a salaried employee, Beggs kept records of the numbers of hours attributed to certain projects, and Amp-Rite had other projects on which it could have utilized Beggs. Patelski's estimated hours for additional engineering time totaled $8,695. Although he was salaried, were it not for the delays on this project, Patelski otherwise would have spent those additional hours on other projects or new projects.

The total hours expended on the project were 10,103 compared with the 3,806 originally estimated. The remainder achieved by subtracting the latter from the former, less Walsh's and Beggs' separately calculated hours, multiplied times the man-hour rate for all contract extras and the overhead fee in the contract equaled $203,616. Responding to the District's suggestion that Amp-Rite's bid was too low to begin with, additional labor hours were also calculated by Amp-Rite on the assumption that the difference between the third low bid and Amp-Rite's bid (a difference of $42,481) was attributable entirely to man-hours. On that basis, the third low bidder would have had an additional 1,357 man-hours in its bid. Assuming Amp-Rite's original bid included those additional hours, its labor estimate would have been 4,301 man-hours. On that basis, its damages would have been calculated out to $154,814.

The additional labor damages claimed included union labor contract price increases, effective after May 31, 1984, which were provided for in Amp-Rite's contract with the District. Amp-Rite also claimed $6,545.60 for various additional work performed by Amp-Rite which was outside the scope of its contract. The contract provided for recovery of such additional costs; three signed work orders refuted in part the testimony of the District's Robert Clavel that this additional work was described by the plans and specifications and, thus, was within the scope of Amp-Rite's contract.

Amp-Rite presented the testimony of its expert witness, Dr. James Adrian, concerning the reasonableness of its claimed additional labor damages and the difficulty of computing damages in any other fashion. The courses Dr. Adrian teaches emphasize the managing of time and costs throughout the construction process. Dr. Adrian has a bachelor's and master's degree in civil engineering with emphasis on construction, and he is a CPA as well. His Ph.D. thesis was on measuring construction productivity, and he has written 10 books on construction management, productivity and estimating.

Dr. Adrian reviewed documents pertinent to the instant project including Amp-Rite's estimate, the specifications, the drawings, correspondence, diaries, schedules and some depositions. He observed the jobsite and discussed the matter with various Amp-Rite employees. He defined productivity as output for personal hours of input; productivity is subject to many variables, such as temperature, weather, morale and ability to do work when it is lined up. The existence of materials is a factor as is direct coordination. It is difficult to perform work productively if the worker does not know what he or she is going to do next.

Dr. Adrian testified that winter construction reduces productivity by 40% to 60%; a 50% loss of productivity, for example, would result in a job taking twice as long as expected. With respect to the work spanning the entire one-third-mile site rather than a lineal progression, Dr. Adrian testified this would involve walking distances, distances to get materials and lack of being able to plan what was to be done next which involves waiting time. The waiting factor would reduce productivity by 40% to 60% and the travel distances a 15% to 25% loss of productivity. Dr. Adrian testified that a project on which there is no one general contractor overseeing all is a very difficult "delivery" system. Although he could not allocate a specific percentage of loss of productivity to the delivery system, he testified it is not unlikely to have a contractor 100% or 200% over on labor where there is a lack of coordination. Dr. Adrian testified that adding up all these adverse and unexpected factors over the history of the project would result in a 400% increase of labor hours. He opined it was reasonable to expect that Amp-Rite could have a twofold to threefold increase in the actual labor hours versus budgeted hours.

As to methods of calculating the lost productivity on this project which was characterized by continued and ongoing types of impact, Dr. Adrian said there are two valid approaches to arriving at the additional hours. The first is Amp-Rite's approach: the difference between budgeted and actually expended man-hours. The second is expert opinion testimony regarding the loss of productivity. Another possibility would be to employ someone with expertise such as his at the project with a video camera to do an on-site analysis of arm-and-leg movement loss.

Dr. Adrian stated that his analysis did not relate a specific loss of productivity to any specific incident. Even interior work would be affected by winter weather depending on the extent of enclosure and the temperature. He did not independently analyze the number of hours overrun due to winter weather, only the impact such weather would have on those hours. He also made no specific analysis of overrun hours expended with respect to any Amp-Rite labor code. In his experience, a construction schedule does not change due to unanticipated events to the degree that the project is built backwards. He assumed Amp-Rite bid the job expecting a certain progress, and, while unanticipated events are to be expected, the contractor does not then build a different project. If so, the original labor budget is totally out of line. One cannot lead a contractor to believe that the work will be done one way, then do another, and not expect it to have a remedy.

Dr. Adrian saw this situation as one where Amp-Rite was reacting rather than knowing where it was going.

For Amp-Rite to have started making records as to the amount of lost productivity when it became aware of the delays would have required it to hire someone like him to do industrial engineering studies of measuring distances, walking, etc. He stated that one could capture the hours if asked to do something which had not been anticipated; the instant situation involved more hours to do base bid work. It was work that Amp-Rite expected under conditions it did not expect. He believed the overrun hours claimed by Amp-Rite were reasonable given the events which occurred, and if those events were not Amp-Rite's responsibility, then Amp-Rite was entitled to do its work according to how it bid the project.

Dr. Adrian testified that, at the time Amp-Rite bid the project, there was no way it could have known if the District would accept combined bids or who the ultimate general contractor would be. Even though the project encompassed the same scope of work, the project as built was a completely different plan and the labor cost totally different.

The District first argues the court "misconstrued" its contract obligations and, therefore, erroneously denied its motion for a directed verdict and its post-trial motion for judgment notwithstanding the verdict. Without identifying in what manner the court misconstrued its obligations under the contract, the District asserts that neither the express nor the implied provisions of its contract with the multiple prime contractors made it the "guarantor" that Amp-Rite would experience *no* interference as the result of the acts or omissions of one of the other prime contractors. Rather, under its express and implied contractual duties, it had only to make the physical land available to Amp-Rite and thereafter act reasonably—even if unsuccessfully—to avoid delays for which Amp-Rite had no responsibility.

Amp-Rite responds that under the law and the terms of its contract the District had the affirmative duty to keep the jobsite in such a state of readiness as to enable Amp-Rite to perform its work within the time called for in the contract and that it impliedly warranted that the site would be prepared in accordance with the contract.

Directed verdicts should be entered and judgments notwithstanding the verdict granted only when all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Moore v. Swoboda* (1991), 213 Ill. App. 3d 217, 231.

As we perceive the District's argument, it is contending that the court's denial of its motions for directed verdict and judgment *n.o.v.* was tantamount to a finding that it agreed with Amp-Rite's view of the District's duty under the contract. Amp-Rite's view was that, as the one common body standing in privity with each contractor, the District alone "had control over the work of each contractor and thereby control over the manner in which the job, as a whole, progressed *** [yet it] passively permitted the delays to snowball by virtue of its failure to exercise authority or supervise the job more closely."

The District contends no express language of the contract states that it will coordinate the work of those to whom it awards the work and, thus, it had no responsibility for same. It acknowledges, citing *Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087, that there is an implied duty of a project owner to take reasonable steps to avoid frustration of a contractor's efforts by lengthy delays for which the contractor bears no responsibility. But, it asserts, this implied duty does not translate to an obligation that the owner *guarantees* in a multiple construction contract situation that the performance of one contractor will not impede the performance of another.

■█ In Illinois, it is settled that, in the absence of contractual provisions to the contrary, a construction contractor has the right to recover increased-cost-of-performance damages resulting from delay caused by default of the contractee. (*Tobey v. Price* (1874), 75 Ill. 645; *Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087; *W.H. Stubbings Co. v. World's Columbian Exposition Co.* (1903), 110 Ill. App. 210.) Such defaults of the contractee include a failure to have buildings ready so work could proceed within the time contemplated by the contract (*W.H. Stubbings Co.*, 110 Ill. App. 210; see also *Nelson v. Pickwick Associated Co.* (1889), 30 Ill. App. 333 (failure to have building in such a state of forwardness as would enable work to be performed within time limit)), and a failure to arrange to have the work of other contractors on the building performed so as to allow the contractor claiming damages for delay to complete its work within the reasonable time implied by the contract (*Michigan Avenue Methodist Episcopal Church v. Hearson* (1891), 41 Ill. App. 89). The right to direct the general progress of the work implies an obligation on the part of the contractee to keep the work in such a state of forwardness as to enable the contractor to perform within the required time, and responsibility for delay rests solely with the con-

tractee. *J.J. Brown Co. v. J.L. Simmons Co.* (1954), 2 Ill. App. 2d 132, 140.

We do not agree with the District that the multiple prime contractor situation in the case at bar limits the instructiveness of the above cases in defining the District's contractual obligations. It is undisputed that the express terms of the contract obligated the District to "furnish *** not later than the date when needed by Contractor, the lands upon which the work is to be done." The District construes this to mean that the project site will be provided for Amp-Rite to *start* its work and not on a building-by-building basis or a work-area-by-work-area basis which, it posits, would be a function of *coordination* of the work, the details of which were specifically turned over to the contractors themselves.

The supplemental conditions in the contract provided:

> "Each Contractor and his Subcontractors shall coordinate their work with adjacent work and shall give due notice to other contractors and subcontractors of intersecting work to assure that all items are installed at an agreeable time and to facilitate general progress of the Work. After the project's construction is approved by the Engineer, the General Contractor [referring here to Wil-Freds as the 'general' contractor] shall coordinate all work by all contractors on the project."

The instructions to bidders included in the contract documents provided that the electrical contract bidder agreed to complete by July 31, 1984, all work specified. A change in this contract time whereby the contractor could obtain an extension of time in which to complete its work could be effected under article 12 of the general conditions for "delays beyond the control of Contractor." Such delays "shall include *** acts or neglect *by any separate contractor employed by Owner* [here, the District]." (Emphasis added.) Article 12 specifically also provided that its provision for a change of contract time "*shall not exclude recovery for damages *** for delay by either party.*" (Emphasis added.)

The contract in *Nelson* included a similar provision whereby extra contract time would be allowed if "delay be caused by other contractors, to the positive hindrance of the contractor [claiming delay]." (*Nelson*, 30 Ill. App. at 335.) The contractor in *Nelson* was delayed by other contractors, and he suffered damage by way of wage increases which would not have occurred if he could have performed in the time to which he agreed. The *Nelson* court held the contractee liable for the delay damages occasioned by the other contractors (whose work preceded that of the claimant contractor), basing its decision on the

ground that it was the legal duty of the contractee to keep the work in such a state of forwardness as to enable the contractor to perform the contract within the time limits specified. (*Nelson*, 30 Ill. App. at 336.) The court reached that conclusion albeit there was language in the contract specifications to the effect that the contractor "should co-operate with the contractors for the other parts, and arrange and carry on his work in such a manner that none of the co-operating contractors should be delayed." (*Nelson*, 30 Ill. App. at 334.) The court stated: "If the [contractee] desired exemption from [its] obligations under the contract, [it] should have put such exemptions in clear language that would have put [the contractor] on his guard, and left no doubt as to what was intended." *Nelson*, 30 Ill. App. at 336.

Similarly, in *Michigan Avenue Methodist Episcopal Church*, the carpenters' work on the church was greatly delayed by "the failure and dilatoriness" of other contractors which caused the carpenters to incur increased material and labor costs which they would not have had if they had been permitted to proceed with reasonable diligence. (*Michigan Avenue Methodist Episcopal Church*, 41 Ill. App. at 92.) The court stated:

> "While no time is fixed by the contract within which the carpenter work is to be finished, it is implied that it shall be done within a reasonable time and that *[the owner] will so arrange with reference to the other work on the building that [the carpenters] may complete it within such reasonable time.*" (Emphasis added.) *Michigan Avenue Methodist Episcopal Church*, 41 Ill. App. at 92.

■ Although we agree the District's duty to keep the project in the state of forwardness is not tantamount to a warranty guaranteeing that no delays will occur (see *Paccon, Inc. v. United States* (Ct. Cl. 1968), 399 F.2d 162, 166-68; *Franklin E. Penny Co. v. United States* (Ct. Cl. 1975), 524 F.2d 668, 674-75), if the District either actively created or passively permitted to continue a condition *over which it had control* which made performance of the contract more difficult or expensive, it may be held to have breached an implied contractual duty for which it must respond in damages. *Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087, 1094, citing *North Shore Sewer & Water, Inc. v. Corbetta Construction Co.* (7th Cir. 1968), 395 F.2d 145.

In *Paccon*, although rejecting the contractor's claim there that the government *warranted* that the second contractor would complete its work in time, the court recognized there could be liability in a two-contractor situation where the government was at fault in some way.

Observing that the governmental representative there promised the first contractor to impose a schedule of priorities of work on the second contractor coordinated with the first contractor's work and that the government had the power to exercise control over the second contractor in the aspects important to the first contractor's performance, the court found it clear that the government had the obligation to do what it reasonably could to see that the second contractor complied with the schedule of priorities. (*Paccon*, 399 F.2d at 168-70.) The gist of the government's obligation was reasonably "to enforce coordination," however, "not to make sure that in any event the [first contractor's] work was left unimpeded." (*Paccon*, 399 F.2d at 171.) As long as the government undertook reasonably to enforce the coordination, the first contractor otherwise assumed the business risk that the government's reasonable attempt to coordinate might be unsuccessful. (*Paccon*, 399 F.2d at 171-72.) The cause there was remanded for a determination of whether the government attempted to enforce the priority schedule with the second contractor as much as it reasonably could be expected to do.

Along this same line, we find cogent the court's opinion in *Websco Construction Corp. v. State* (Ct. Cl. 1966), 57 Misc. 2d 9, 292 N.Y.S.2d 315. That case concerned a claim against the State brought by the general construction contractor for delays caused by the other prime contractors for electrical and heating work. Under their agreements, the prime contractors were required to harmonize and install their work in conjunction with the work of the other contractors. The essence of the general contractor's claim against the State was that it had a duty to coordinate the work of the prime contractors and that it failed to perform that duty. Although some delays were to be anticipated under the multiple prime contractor arrangement, the court noted: "[T]he State had a duty to regulate and coordinate with reasonable diligence the activities of the several prime contractors for the simple reason, if no other, *that no one else had the authority to so act.*" (Emphasis added.) 57 Misc. 2d at ____, 292 N.Y.S.2d at 316.

■ The contract at bar provided project completion dates for each of the three prime contractors, and time was "to the essence," not provisional, as in *J.F. Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 929, 934. The contract required that the contractors follow the general construction schedule, that they coordinate their work with each other, and that Wil-Freds coordinate work by all contractors after the project construction schedule was approved by Strand. Although Wil-Freds had the authority to coordinate the work of the contractors, it had no power to

enforce that coordination. Under the express terms of its contract with each of the contractors, the District alone could withhold payments from, take over the work of, or terminate an offending contractor for the reasons specified in the contract. As such, its admitted implied obligation to take reasonable steps to avoid frustration of a contractor's efforts by lengthy delays for which the contractor has no responsibility includes, under the multiple prime contractor situation here, the implied obligation reasonably to use its power under the terms of the contract *to enforce* the coordination of the contractors. Whether the District's efforts to enforce coordination of the contractors were reasonable was a factual question for the jury to determine. Based on this record, we find the court did not err in construing the District's duty under the contract and in refusing its motions for directed verdict and for judgment notwithstanding the verdict.

The District next claims that Amp-Rite's proof failed to show it breached the contract and, thus, its motions for directed verdict and judgment notwithstanding the verdict were improperly denied. Here again, the *Pedrick* standard of review applies. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.

The District argues Amp-Rite's proof failed to present a *prima facie* case of breach of the District's implied duty to take reasonable steps to protect it from lengthy delays caused by others. It asserts Amp-Rite failed to adduce any evidence that any of the remedial actions it suggested the District could have exercised would actually have improved job progress. Specifically, Amp-Rite's project manager testified at trial that the District could have continued to withhold payments from the responsible contractors, exercised its contractual right to make good deficiencies in the work being neglected by the contractors, or terminated the offending contractor's services.

As an example, the District argues there was no proof that a suitable replacement contractor for Northwestern could have been obtained on a timely basis without adversely affecting job progress. Generally, other contractors would be unwilling to take over the work absent termination of the other contractor's contract, which termination, in turn, would necessitate involvement of the terminated contractor's surety, familiarization of the replacement contractor with the project, reacquisition of materials, and, possibly, rebidding of the project along with the attendant consultation with other governmental agencies involved in funding the project. Counterbalancing this against its efforts to keep the original contractors on the job, encouraging them to improve their performances, the District concludes Amp-Rite did not demonstrate that it failed to exercise reasonable dil-

igence and judgment in fulfilling its contractual obligations to Amp-Rite.

Amp-Rite responds, correctly so, that the District's argument in this regard entirely ignores the fact that there were several bases for its breach of contract claim as enumerated in count I described in the opening paragraphs. The jury rendered a general verdict on count I. As such, under section 2—1201 of the Civil Practice Law (Ill. Rev. Stat. 1989, ch. 110, par. 2—1201(a)), the District must establish that the evidence was insufficient to sustain *any one* of the alternative grounds for recovery. The District has not challenged in any manner the sufficiency of the evidence to establish that it breached its contract with Amp-Rite by not granting Amp-Rite an increase in the contract price under the terms of the contract. (See *Siegal v. Health Care Service Corp.* (1980), 81 Ill. App. 3d 784, 790-91.) Thus, its argument as to this issue fails on that technical ground. Without addressing the substantive merits of the issue, we simply note that on two occasions when the District threatened punitive actions against Northwestern as provided in the contract, Northwestern complied with the District's requests. Clearly, this may be viewed in Amp-Rite's favor as evidence tending to withstand the District's motions for directed verdict and judgment notwithstanding the verdict.

The District next contends Amp-Rite's proof failed, as a matter of law, to entitle it to use the "total cost" method of calculating its damages, as opposed to the "discrete" method, and that judgment notwithstanding the verdict should have been entered on count I. Of the total amount of damages claimed by Amp-Rite, alternately calculated amounts of either $203,600 or $154,814 were claimed for additional labor expense. As noted previously, the larger figure was calculated with reference to Amp-Rite's own bid; the lesser figure was calculated with reference to the third lowest bid received by the District for "reasonableness-of-the-bid" comparison purposes.

Unlike the "usual" total cost approach which is based on total contract expenditures (see *Boyajian v. United States* (Ct. Cl. 1970), 423 F.2d 1231, 1242), Amp-Rite's total cost method of calculating damages compared only the total number of labor hours actually expended in constructing the project (10,103) with the total number of labor hours Amp-Rite estimated would be required to construct the project (3,806). Additional supervision hours were then subtracted out as a separate item, and the remainder was multiplied by the man-hour rate being charged to the District for all contract extras and the overhead fee provided in the contract. The damages thusly calculated totaled $203,616. In contrast, the "discrete" method of calculating dam-

ages would isolate either specific items of work which were delayed or time periods of lower workers' productivity and then identify the overrun hours specifically attributable thereto.

The only Illinois case discovered which has discussed the total cost method came out of this district. We found there, though, that we did not need to determine whether the total cost method was improperly used in that case to calculate delay damages where we found the contracting authority had not breached its contract with the claimants. (*Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority* (1987), 153 Ill. App. 3d 918, 929.) Consequently, the parties necessarily have resorted to Federal cases which have either allowed, or not, that the total cost method was appropriate under the facts presented. These Federal cases are lengthy and detailed. The total cost method guidelines which emerge therefrom are consistent, however.

■■ ■ The total cost method is premised on the principle that, where a contractor is entitled to an adjustment, the contracting entity should not be relieved of its liability for same merely because the contractor is unable to prove its increased costs within a mathematical certainty. (*John F. Harkins Co. v. School District of Philadelphia* (1983), 313 Pa. Super. 425, 431, 460 A.2d 260, 263.) The total cost method is not favored, however. (See, *e.g., John F. Harkins Co.*, 313 Pa. Super. at 431, 460 A.2d at 263; *Moorhead Construction Co. v. City of Grand Forks* (8th Cir. 1975), 508 F.2d 1008, 1016; *WRB Corp. v. United States* (1968), 183 Ct. Cl. 409, 426.) It is not a preferred means of calculation because it is imprecise (*John F. Harkins Co.*, 313 Pa. Super. at 431, 460 A.2d at 263) and because it assumes the plaintiff's costs were reasonable, that plaintiff was not responsible for any increases in cost, and that the plaintiff's bid was accurately computed, which is not always the case (*Wunderlich Contracting Co. v. United States* (Ct. Cl. 1965), 351 F.2d 956, 965; *F.H. McGraw & Co. v. United States* (Ct. Cl. 1955), 130 F. Supp. 394, 400). Whether the total cost method of determining damages will be deemed acceptable in a given case depends on the plaintiff proving "that (1) the nature of the particular losses make [*sic*] it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses." *WRB Corp.*, 183 Ct. Cl. at 426, citing, *inter alia, J.D. Hedin Construction Co. v. United States* (Ct. Cl. 1965), 347 F.2d 235, 246-47, and *F.H. McGraw & Co.*, 130 F. Supp. at 400.

The District argues here that Amp-Rite's proof in each of these regards was insufficient. Specifically, it first contends Amp-Rite failed

to prove that the damages it sustained as to its additional labor expense were impossible or highly impractical to determine with a reasonable degree of accuracy by a method other than total cost. The District claims more than ample records were available from which Amp-Rite could have calculated its damages using the discrete, or direct, method. It points to minutes of the construction progress meetings which showed that Amp-Rite recognized as early as August 1, 1983, which was two months into the project, that its work was being impacted by the delayed performance of the other prime contractors and that Amp-Rite continued to complain of such delays in subsequent meetings. Coupled with this early "claim recognition," the District further asserts Amp-Rite had the ability to, and did, keep contemporaneous records of delays and extra work, and it recorded on a daily basis the type of work the workers were performing. As such, the District concludes Amp-Rite's expert's opinion was entitled to no weight. As noted earlier, Dr. Adrian's opinion was that if it were not for the use of the total cost method, someone with his industrial engineering background would have had to conduct an on-site video camera "analysis of arm and leg movement loss because of the impact and the added distances that [the workers] walked" in order to arrive at some kind of computation of damages.

Amp-Rite responds that, although it could easily recount the hours required to do work which was not anticipated, the problem it encountered here was the performance of base contract work done under unanticipated conditions. That is, the project, rather than proceeding in an orderly progression from west to east, spanned the entire one-third-mile length. The project was extended from 14 to 22 months and included two winters, whereas Amp-Rite anticipated it would perform work indoors through one winter based on the contract specifications. Additionally, the physical site was "like a bomb hit it," due to the numerous excavations throughout the site, making storage of equipment and travel back and forth exceedingly difficult. Amp-Rite tried to calculate a specific amount of delay and a specific dollar value attributable to each item of delay but found it was impossible. Amp-Rite's project manager testified it would have required having someone follow workers around the jobsite as the work was being done in order to compare the amount of time it was taking to what the time would be under normal circumstances. The "ripple effect" caused by the delays—one delay leading to another—compounded the problem of identifying the impact on an individual item-of-delay basis. Further, Amp-Rite's expert's opinion that the total cost method was appropriate in this case was premised on the fact the de-

lays caused by the other prime contractors impacted the productivity of the workers in terms of "waiting, weather, job site conditions, traveling, and difficult working conditions."

■ In our opinion, such impact is not "discrete," which term means separate and distinct, not attached to others, unrelated or discontinuous. (Webster's New World Dictionary 402-03 (1972).) Rather, it pervaded the project, making the nature of Amp-Rite's losses in terms of additional labor expense "impossible or highly impractical" to determine with a reasonable degree of accuracy. Where the pervasive nature of the problems encountered renders an exact calculation of losses impossible or highly impractical, the total cost method is applicable. (*State Highway Comm'n v. Brasel & Sims Construction Co.* (Wyo. 1984), 688 P.2d 871, 879 (total cost method approved where inadequate water supply and unexpected deposits of clay in the gravel pit resulted in delays throughout the entire construction period; daily difficulties encountered in crushing and handling wet clay or in excavating large quantities of dirt with insufficient water resulted in additional costs not subject to precise measurement); *Moorhead Construction Co.*, 508 F.2d at 1018 (total cost method approved where unexpected soft soil conditions forced the contractor to work by different, more expensive methods without heavy equipment); *J.D. Hedin Construction Co. v. United States* (Ct. Cl. 1965), 347 F.2d 235, 246-47 (total cost method approved where faulty government pile specifications caused contractor to incur foundation work costs which could have been avoided by earlier completion of the pile-driving operations before adverse winter weather conditions created a myriad of problems).

■ The District next argues the total cost method was not appropriate here because the testimony showed that not all the labor overrun hours were due to causes attributable to it. As in all breach of contract cases, the costs must be tied in to fault on the defendant's part. (*J.D. Hedin Construction Co.*, 347 F.2d at 259.) For example, it asserts Amp-Rite's total cost claim included hours for these causes: (1) the flood in the sand filter building; (2) acts of God; (3) damage caused by other contractors to Amp-Rite's work; (4) problems with materials furnished by other prime contractors; and (5) problems with Amp-Rite's subcontractor, Allan Engineering. Citing *Boyajian v. United States* (Ct. Cl. 1970), 423 F.2d 1231, 1244, the District argues that because there was no evidence whereby the jury could isolate and remove these impermissible hours from its award, Amp-Rite's total cost claim must fail.

Initially, we note the District argues its nonresponsibility for these causes as a "corollary" to the requirement that before the total cost method may be utilized, the plaintiff must prove that its own inefficiencies were not responsible for the added expenses. It is uncontradicted, however, that no inefficiencies of Amp-Rite were responsible for the added labor expenses. The District's eventual grant of a 15-week extension of the contract time to November 15, 1984, under the terms of article 12 of the contract and its subsequent implied extension of time to January 17, 1985, bespeak Amp-Rite's lack of fault. *J.D. Hedin Construction Co.*, 347 F.2d at 245 (the grant of an extension of time carries the admission that the delays resulted through no fault of the contractor).

Next, we find *Boyajian* does not support the District's argument in this regard. In that case, all three of the plaintiff's causes of action related to delays, additional work, labor and services arising out of the necessity of plaintiff obtaining certain testing equipment called a Zifor which the defendant required be used for testing and calibration of the equipment being manufactured for the defendant by plaintiff. The damage proof relied upon in seeking to apply the total cost method consisted only of a single subtraction of contract receipts from total expenditures. In reviewing the use of the total cost method in other cases, the *Boyajian* court observed that in each instance the plaintiff's recovery based on total cost "was refined by appropriate adjustments" (*Boyajian*, 423 F.2d at 1242), such as in *Great Lakes Dredge & Dock Co. v. United States* (1951), 96 F. Supp. 923, where the difference between the contractor's actual and estimated costs was adjusted for the contractor's underestimated bid as well as costs for which the contractor was responsible and which were not attributable to the changed condition. The mere subtraction of receipts from expenditures was "only a starting point." (*Boyajian*, 423 F.2d at 1242.) The excess costs claimed also had to be tied into defendant's breaches and the reasonableness of its estimates and actual costs sufficiently proved. Plaintiff there made no reasonable attempt to show how much more work, labor and services had to be performed because of the necessity of obtaining a Zifor, and the court rejected the total cost method. Because the record before it was blank, however, with regard to any other reasonably satisfactory evidence of what plaintiff's damages were, the *Boyajian* court dismissed plaintiff's claim.

Of the numerous factors shown to have had an impact on Amp-Rite's job progress here, not all were claimed to have increased its labor hours. Its evidence clearly tied the labor overrun hours specifically to the District's failure to coordinate the work of the contractors

according to the general construction schedule set forth in the contract documents. The District's failure to enforce coordination was alleged to be the cause of the hopscotching, the starting and stopping, the waiting, the gearing up to do a job and not being able to do it, and the need to work outdoors in less productive winter weather conditions. Close examination of the events the District claims were not attributable to it shows either that delay damages were applicable under the contract provisions or that the event was not a labor-hour increasing one. Article 12 of the contract did not preclude damages for delay caused by acts of God (such as the flood in the sand filter building due to heavy rains), or for delays caused by acts or neglect by any separate contractor employed by it (such as the second flooding of the sand filter excavations, damage to Amp-Rite's work by other subcontractors, and problems with materials furnished by other subcontractors).

As to problems with Amp-Rite's subcontractor, Allan Engineering, there was evidence presented by the District that Amp-Rite withheld payments to Allan and that this delayed the completion of the supervisory control system which, in turn, delayed final completion of the project. That evidence was introduced by the District in relation to Amp-Rite's claim in count II that the District breached its contract in assessing liquidated damages against it for failing to complete the project on time. No problems with Allan were claimed by Amp-Rite to have increased its labor hours. We conclude the District's argument in this regard fails to establish the inapplicability of the total cost method on this basis.

■ The District next argues Amp-Rite's bid was "unrealistic" in that it unrealistically assumed (1) the west end buildings would be completed before the east end buildings were started; (2) the multiple prime contractor delivery system would have no bearing on the number of hours required to do the work; (3) Northwestern's underground piping excavation and installation would be done without interruption; and (4) the conditions of installation warranted double downward factoring of the labor hours in its bid to reflect easiest-level installation conditions.

Amp-Rite responds that, in preparing its bid, it was entitled to rely on the contract documents (see *Eric A. Carlstrom Construction Co. v. Independent School District No. 77* (Minn. 1977), 256 N.W.2d 479, 484), including the general construction schedule therein, which every witness, including the District's own expert, understood to show a west-to-east progression of the project work. Voluminous evidence was adduced concerning the manner in which Amp-Rite's bid

was prepared by Messrs. Voss, Williamson and Adaska. Its reasonableness was not overwhelmed by the District's evidence of the unfactored, "straight-NECA takeoff" bid prepared by its expert which was shown to be fatally flawed in its unrealistic conclusion that the number of labor hours which should have been estimated for the project was 9,433.

Viewing the evidence in the light most favorable to Amp-Rite, its bid was not unreasonable. It is clear the general construction schedule in the contract documents was revised more than once to accommodate Wil-Freds' major concrete construction work, to make up for Wil-Freds' and Northwestern's delays and to stay on schedule. Although these revisions may have been in the District's best interest, they prejudiced the benefit of the bargain Amp-Rite had struck with the District. (See generally *L.L. Hall Construction Co. v. United States* (Ct. Cl. 1966), 379 F.2d 559, 564.) The District openly acknowledged it knew the revised schedule prepared in November would cause problems for Amp-Rite. Amp-Rite reasonably need not have anticipated the extensive delays which occurred from the very start of the project. It was entitled to rely on the general construction schedule in its bid preparation.

Although hindsight on this project shows that the possibility there might be multiple prime contractors on the project should perhaps have been a bidding consideration (*J.F. Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 929, 931 ("potential loss from delay is inherent in any construction project [citation], particularly one involving coordinated efforts of multiple contractors")), there was no way for Amp-Rite to know at the time it bid the project whether a single, a combination, or multiple bids would be accepted by the District. Thus, the NECA manual's caution concerning increasing labor hours depending on the known effectiveness or experience of "the person who has the overall responsibility to manage the construction" reasonably could not have been heeded. Further, the recommended labor units in the NECA manual themselves were based on the assumption, as was Amp-Rite's labor estimate, that the construction project would be "effectively" managed. Amp-Rite was entitled to assume that the District would reasonably use its punitive powers under the contract to keep offending contractors on schedule.

It is true that the general construction schedule did not set forth with any specificity *when* Northwestern would install its underground piping so that Amp-Rite could follow along. However, Northwestern's contract with the District required that it also follow the general con-

struction schedule, and, despite the District's belated suggestion that Amp-Rite use an alternate trenching route for a portion of the conduit paralleling Spring Brook Creek at its own expense, the plans and specifications showed that Amp-Rite's electrical conduit was to be placed in the same location as Northwestern's underground piping. Consequently, it was not unreasonable for Amp-Rite to assume when making its bid that Northwestern would effectively prosecute its work in line with the general construction schedule, thus allowing Amp-Rite seasonably to follow along. Although some delays are inevitable in any project, Amp-Rite could not know during its bid preparation that Northwestern would fall six months behind schedule in its work or that the delays experienced by Wil-Freds and the accelerated schedules devised in response would so substantially prejudice it. A "reasonable" bid is just that; it need not be prepared along "worst scenario" lines.

As to the double downward factoring of the labor hours in Amp-Rite's bid, the District argues this was not justified based on its own expert's testimony that the instant wastewater treatment project, which was equivalent in terms of difficulty of construction to that of a chemical plant, warranted a bid based on 9,433 labor hours. This compares with Amp-Rite's 3,806 estimated hours and its 10,103 actual hours.

The District's expert's estimate admittedly did not take into consideration any aspects of the project which would cause an increase or decrease in the estimated hours, however, and Amp-Rite's cross-examination and rebuttal exposed numerous labor hour computations regarding prewired control systems and panels and multiple conduit runs that would have justified downward factoring of the labor hours. Additionally, the District's expert was neither an electrician nor a builder and had no experience in using the NECA manual. The second downward factoring of Amp-Rite's bid was performed by its president, Ron Adaska, who based that second reduction in labor units on the high productivity of workers in Du Page County as experienced by Amp-Rite in previous projects.

■■ The District's final contention as to the applicability of the total cost method is that Amp-Rite did not prove its actual costs were reasonable. The District notes it does not contend that Amp-Rite did not accurately record the labor overruns. Rather, it believes that the overrun shows either that Amp-Rite had the correct number of workers on the project to do the work as it became available, in which case Amp-Rite's estimated hours were too low, or Amp-Rite kept an inor-

dinate number of men available to do work which was not ready to be done, in which case Amp-Rite's overrun hours are unreasonable.

We agree with Amp-Rite that the District's argument in this regard stands in "rather astounding juxtaposition" to its preceding argument that Amp-Rite's labor hours were estimated unreasonably low and should have been more in the neighborhood of 9,433 hours without even considering any of the adverse conditions which were actually experienced during the construction. If the District's position is that 9,433 labor hours would have been a "reasonable" estimate under normal conditions, can it seriously argue that total actual labor hours of 10,103 (which includes 6,297 labor overrun hours) under the adverse and extenuated conditions which occurred here are unreasonable? We do not think so.

We further note that the District's belated extensions of time for completion of the contract as requested by Amp-Rite, and Wil-Freds' "Just watch where I go" approach to project coordination, placed Amp-Rite in the position of having to keep men on the job to do whatever work became available in order to try to meet the scheduled completion date.

In sum, we conclude the evidence, viewed in its aspect most favorable to Amp-Rite, did not so overwhelmingly favor the District that no contrary verdict could ever stand. Consequently, the court did not err in denying the District's motion for judgment notwithstanding the verdict.

■■■ The District next argues Amp-Rite's proof of its other damages was insufficient. Specifically, it finds either improperly claimed or insufficient proof of (1) additional foremen expense ($22,309); (2) additional supervision expense ($1,455); (3) additional engineering management expense ($8,695); (4) wage increase expenses ($1,311); and (5) extra work claims ($6,545).

We find the District's argument on this issue is without merit. The amount of the jury's verdict was less than even the total labor overrun hours claimed by Amp-Rite, without even considering these other damages, and there is no way of knowing whether any of these "other damages" items were included in its verdict. Consequently, it cannot be ascertained whether the insufficiency, if any, of the proof of these damages prejudiced the District. Without such prejudice, the District can claim no basis for reversal.

The District next contends the jury was improperly instructed on the matter of its contractual obligations to Amp-Rite in its issues instruction No. 9, a modified version of Illinois Pattern Jury Instruc-

tions, Civil, No. 20.01.01 (3d ed. 1991). In pertinent part, Amp-Rite's instruction No. 9 provided:

"The plaintiff claims that the defendant breached its contract with the plaintiff in one or more of the following ways:

a. Failed to furnish, as indicated in the contract and not later than the date when needed by plaintiff, the lands upon which its work was to be done;

b. Failed to keep the buildings in such a state of forwardness so as to enable the plaintiff to perform its work within the time contemplated in the contract;

c. Actively created or passively permitted to continue a condition over which the defendant had control which rendered plaintiff's performance under the contract more difficult and more expensive; and

d. Failed to grant plaintiff's requests for an increase in contract price."

The District claims the giving of this instruction was improper because subparagraph b expresses a duty which it had not assumed, which was not alleged in Amp-Rite's complaint and which was not created under the contract between itself and Amp-Rite.

Amp-Rite argues this issue is waived because it was not raised in the District's post-trial motion. We agree. Illinois Supreme Court rules provide that in jury cases a party may not urge as error on review of the ruling on his post-trial motion any point, ground, or relief not specified in the motion. (134 Ill. 2d R. 366(b)(2)(iii); see *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344.) The District cites no authority in support of its argument that the waiver provisions of Supreme Court Rule 366 somehow are not applicable because it objected to plaintiff's instruction No. 9 during the instructions conference. Consequently, we conclude this issue has not been properly preserved for review. As such, we do not consider the District's further argument as to how the court's refusal of its tendered instruction No. 8 regarding the parties' duties under the contract "compounded" the error with regard to plaintiff's instruction No. 9. The waiver provisions of Supreme Court Rule 366 also apply to the District's claim that the court erred in giving Amp-Rite's instruction No. 12 regarding the burden of proof in that the District's post-trial motion did not include that ground.

The District's final contention is that the court erred in giving Amp-Rite's instructions Nos. 23 and 24, to wit:

"In determining the amount of damages the plaintiff is entitled to from the defendant proof need not be so positive as to

enable you to make an absolute determination of the precise excess costs resulting from delays chargeable to the defendant, but an approximate and reasonable determination may be made by you on the basis of the facts and circumstances and the best available evidence, in such amount as, in your judgment, resulted from defendant's breach." Plaintiff's Instruction No. 23.

"If you should find that any portion of plaintiff's delay in completing its work was due to its own fault, while the remainder of its delay was the fault of the defendant, you may reduce the total damages according to the amount of delay attributable to the plaintiff." Plaintiff's Instruction No. 24.

Instruction No. 23 was based on the authority of *L.L. Hall Construction Co. v. United States* (Ct. Cl. 1966), 379 F.2d 559, and instruction No. 24 was based on *Pathman Construction Co. v. Hi-Way Electric Co.* (1978), 65 Ill. App. 3d 480.

Although the District did not specifically denote the giving of these numbered instructions as error in its post-trial motion, it specifically argued there, as it does here, that the giving of these instructions was error because, rather than instructing the jury as to the measure of damages under the total cost method, they gave the jury "unbridled discretion" to reduce—in a "modified" total cost approach—the amount of damages without any proof being offered by Amp-Rite connecting any amount of damage to any specific delay or wrongdoing on the part of the District.

The District cites no authority in support of its argument that these instructions were erroneous, and it may be rejected for that reason alone. (*State Farm Mutual Automobile Insurance Co. v. Haskins* (1991), 215 Ill. App. 3d 242, 248; *Rockford Memorial Hospital v. Schueler* (1988), 167 Ill. App. 3d 358.) Its argument hinges on the availability of the total cost method in this case. We have found above that it was available, however, and the jury's award on the basis of that approach reasonably could have been reduced to reflect its nonacceptance of any of a combination of the additional expenses claimed by Amp-Rite such as those for supervisory and engineering expenses, the wage increase, and unpaid invoices.

Although damages may not be predicated on mere speculation or conjecture (*Ellens v. Chicago Area Office Federal Credit Union* (1991), 216 Ill. App. 3d 101, 107), absolute certainty concerning the amount of damages is not necessary; the evidence need only tend to show a basis for the computation of damages with a fair degree of probability (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 645). Damages are speculative only when uncertainty exists as to the fact of

damages rather than the amount of such damages. *Jackson Jordan, Inc. v. Leydig, Voit & Mayer* (1990), 199 Ill. App. 3d 728, 734.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

REINHARD, P.J., and NICKELS, J., concur.